[Civ. No. 18732. Third Dist. Feb. 27, 1980.]

FRANCES DINONG et al., Petitioners, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY,
Respondent;
KAISER FOUNDATION HOSPITALS et al.,
Real Parties in Interest.

**COUNSEL**

Matheny, Poidmore & Hoffman, Anthony J. Poidmore and Evelyn M. Matteucci for Petitioners.

No appearance for Respondent.

McNamara, Lewis, Dodge & Houston, Richard E. Dodge, Paul M. Hoff and Robert M. Slattery for Real Parties in Interest.

**OPINION**

**SPARKS, J.*—**We consider the applicability of an arbitration clause in a group health benefits contract.

Petitioner Pascual Dinong (Mr. Dinong) enrolled in the Kaiser Foundation Health Plan (Kaiser) through the Sacramento Army Depot on December 15, 1975. Coverage for him and his family became effective January 11, 1976. Later in 1976, the United States Civil Service Commission (commission) and Kaiser executed a new group benefits contract which became effective January 1, 1977. Section 1.10 of the new contract provided for binding arbitration of claims "arising out of

---

*Assigned by the Chairperson of the Judicial Council.

the rendition or failure to render services under this Agreement, irrespective of the legal theory upon which the claim is asserted." The arbitration procedures prescribed included notice to Kaiser of a claim, deposit of $150 for arbitration fees by the claimant and by Kaiser, selection of one arbitrator by each party, selection of a third arbitrator by the two chosen by the parties, and an arbitration hearing.

Copies of a brochure describing the terms of the new agreement were made available to Army Depot employees in November 1976. Neither Mr. Dinong nor his wife, however, was aware of the arbitration clause in the agreement when Mrs. Dinong sought prenatal care at a Kaiser Hospital in July 1977; they did not learn of the arbitration provisions of the contract until litigation began in 1978.

In November 1978, petitioners filed a complaint alleging Kaiser carelessly treated Mrs. Dinong during her pregnancy, failed to disclose relevant medical information to her regarding her treatment, caused the death of petitioners' daughter, Baby Girl Dinong, on November 20, 1977, and caused Mr. Dinong emotional distress when he watched the delivery of his malformed and mutilated daughter. Relying on the arbitration clause in the commission-Kaiser agreement, Kaiser, in January of 1976, petitioned the court to compel arbitration. The superior court ordered arbitration and denied petitioners' motion for reconsideration. Petitioners then applied to this court for a writ of mandate to compel the court to deny arbitration and permit their cause to proceed towards a trial by jury. We issued an alternative writ of mandate and will consider the merits of the petition.[1]

I

Petitioners contend that the arbitration provision of the commission-Kaiser agreement is invalid and does not bind them. Their first argument is based upon the wording of Code of Civil Procedure section 1295, subdivision (f) (hereinafter 1295(f)), as it read in November of 1976 when Kaiser made brochures describing the 1977 contract available.

Section 1295 was enacted in 1975 to deal with the medical malpractice insurance crises. (Stats. 1975, Second Ex. Sess. 1975-1976, ch. 1,

---

[1]Review by mandamus is appropriate in these circumstances. (*Bertero* v. *Superior Court* (1963) 216 Cal.App.2d 213, 222 [30 Cal.Rptr. 719]; *Hawkins* v. *Superior Court* (1979) 89 Cal.App.3d 413, 415, fn. 1 [152 Cal.Rptr. 491].)

§ 26.6, p. 3975.) In general, section 1295 insulates certain medical service contracts containing arbitration clauses against attack on grounds they are adhesive, unconscionable, or otherwise improper. In order to be so insulated, the contract must contain prominent notice, in statutory language, of the arbitration clause. Its purpose is to give people signing such agreements the forewarning that they are relinquishing the right to a jury or court trial if a malpractice issue arises. (*Wheeler* v. *St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 361, fn. 11 [133 Cal.Rptr. 775, 84 A.L.R.3d 343].) To that end, subdivision (a) of section 1295 requires an arbitration clause in the first article of a medical services contract and specifies the language to be used. Subdivision (b) requires a statement in 10-point bold red type, again in specified language, to be placed immediately before the signature line of the contract. Subdivision (c) provides for rescission of the contract by written notice within 30 days of signature. (Stats. 1975, Second Ex. Sess. 1975-1976, ch. 1, § 26.6, pp. 3975-3976.)

Subdivision (f) of section 1295 was amended later in the extraordinary legislative session to provide: "Subdivision (a) (b) and (c) shall not apply to any health care service plan contract offered by an organization registered pursuant to Article 2.5 (commencing with Section 12530), of Division 3 of Title 2 of the Government Code, which has been negotiated to contain an arbitration agreement with subscribers and enrollees under such contract." (Stats. 1975, Second Ex. Sess. 1975-1976, ch. 2, § 1.195, p. 3995.)

Government Code section 12530 et seq., in effect from September 17, 1965 (added by Stats. 1965, ch. 880, § 1, p. 2482 et seq.) to July 1, 1976 (repealed by Stats. 1975, ch. 941, § 1, p. 2070; Stats. 1976, ch. 4, § 3, p. 3), was known as the Knox-Mills Health Plan Act (Knox-Mills). Kaiser was registered with the Attorney General pursuant to the requirements of Knox-Mills. At almost the same time section 1295 was enacted, the Legislature repealed Knox-Mills and replaced it with the Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene), codified in Health and Safety Code section 1340 et seq., operative July 1, 1976. (Stats. 1975, ch. 941, § 2, p. 2070 et seq.) Very shortly thereafter, 1295(f) was amended to change the reference from Knox-Mills to Knox-Keene. (Stats. 1975, Second Ex. Sess. 1975-1976, ch. 2, § 1.196, pp. 3996-3997.) The amendment took effect December 12, 1975, and the exclusive exemption for Knox-Keene registered plans remained in effect until January 1, 1977, when the Knox-Mills exemption was reinserted in 1295(f). (Stats. 1976, ch. 1185, § 92, p. 5320.) Thus, from

December 12, 1975, until January 1, 1977, Knox-Mills registered health plans were not explicitly excluded from the requirements of 1295, subdivisions (a), (b) and (c), by 1295(f).

Petitioners argue that since the Kaiser brochure was made available during the time period when 1295(f) did not explicitly exclude Knox-Mills plans (Nov. 1976), and Kaiser was not registered under Knox-Keene at that time, the arbitration clause in the 1977 contract is unenforceable. In opposition, Kaiser points out that the December 12, 1975, amendment replacing the Knox-Mills exemption with the Knox-Keene exemption was made contingent upon the passage of Knox-Keene (Stats. 1975, Second Ex. Sess. 1975-1976, ch. 2, § 1.197, p. 3997), and argues that the contingency shows legislative intent to continue the exemption of Knox-Mills plans in effect. Kaiser further argues that it had done everything it could have done to effect the transition from Knox-Mills registration to Knox-Keene licensing before it issued the brochure.

Neither party challenges the applicability of section 1295, subdivisions (a), (b) and (c), to a brochure describing a contract as opposed to the contract itself. For the purposes of this case only we will accept their applicability assumption because we believe section 1295 expresses a strong legislative concern with fair notice of the use of arbitration procedures to resolve malpractice disputes.[2] Our reading of Knox-Keene as enacted (Stats. 1975, ch. 941, § 2, p. 2071 et seq.) indicates it is an elaboration and refinement of Knox-Mills. Specific standards for health care service plans are delineated (see Health & Saf. Code, §§ 1367-1370) and responsibility for administration and enforcement of statutory provisions is shifted from the Attorney General to the Commissioner of Corporations (see Health & Saf. Code, § 1341). When Knox-Keene was enacted, the transitional provisions provided that plans registered under Knox-Mills could continue to operate under the provisions of the former act until license applications for Knox-Keene were processed. (Stats. 1975, ch. 941, § 2, p. 2076; see Health & Saf. Code, § 1350.) Knox-Mills plans were required to notify the commissioner promptly of their intention to seek a Knox-Keene license. (*Ibid.*) Kaiser so notified the commissioner on July 9, 1976, and filed the required application for licensing (Health & Saf. Code, § 1350, subd. (a)) on September 30, 1976.

---

[2]See *Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 708, footnote 9 [131 Cal.Rptr. 882, 552 P.2d 1178], for the court's description of section 1295 as applicable to individual medical services contracts.

In 1977, a second paragraph was added to Health and Safety Code section 1350, subdivision (a). It required the commissioner to issue transitional licenses on October 1, 1977, to Knox-Mills registered plans not previously granted or denied licenses under section 1353 of the same code. Section 1353 authorized the commissioner to issue licenses to qualified plan applicants and was part of the original enactment. The record before us is devoid of any information as to whether any licenses were issued under section 1353 before October 1, 1977. Kaiser was issued a transitional license on October 1, 1977, and was licensed by the commissioner on November 4, 1977.

Given the close connection between Knox-Mills and Knox-Keene, the realities of transferring administrative responsibility from one state bureaucracy to another, and the complexity and scope of the malpractice insurance crisis legislation, we find petitioners' reading of 1295(f) to exclude Kaiser from the exemption overly technical and contrary to the intent of the Legislature. Kaiser was exempt from section 1295, subdivisions (a), (b) and (c), by a fair reading of 1295(f) when it distributed the descriptive brochure.

We also reject petitioners' argument that the plain meaning of 1295(f) precludes judicial construction. The statute was a small part of a massive and complex legislative effort to cope with a difficult problem. As our recitation of its history and wording demonstrates, the proper application of 1295(f) in November 1976 cannot be determined from its terms alone.

Petitioners' contention that holding Kaiser exempt from the requirements of 1295, subdivisions (a), (b) and (c), requires a retroactive application of the amendment which reinserted the reference to Knox-Mills is also unpersuasive. The amendment was a clarification, not a change in the law.

Petitioners further argue that since Knox-Mills registered plans were not automatically licensed under Knox-Keene, the Knox-Keene exemption in 1295(f) could not have included Kaiser. As we have noted, Knox-Keene regulations and standards are more elaborate than those of Knox-Mills. It does not necessarily follow, however, that plans involved in the transition between the two regulatory schemes were not exempted by 1295(f) when the Knox-Keene licensing process apparently proceeded more slowly than originally envisioned by the Legislature.

## II

■ Petitioners attack the validity of the arbitration clause in the contract between Kaiser and the civil service commission by contending that the commission was not acting as an agent of the Army Depot employees when it negotiated the agreement. They also claim that the commission lacked implied authority to provide for arbitration. We are unconvinced. Petitioners attempt to distinguish *Blos* v. *Bankers Life Co.* (1955) 133 Cal.App.2d 147 [283 P.2d 744] and *Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699 [131 Cal.Rptr. 882, 552 P.2d 1178], both of which held that employers negotiating group medical contracts acted as agents of their employees, on the ground that elected representatives of the employees were apparently not involved in the 1976 negotiations which led to the contract before us. We simply do not read either of the cited cases to require elected employee representatives to be involved in the contract negotiations in order to avoid an adhesion contract in which an arbitration clause might be void. We find equally unpersuasive petitioners' claim that arbitration is a usual and proper means of resolving disputes such as theirs (see *Madden* v. *Kaiser Foundation Hospitals, supra*, 17 Cal.3d at p. 708) only when employee elected representatives are involved in the negotiations. As a matter of law, the commission was authorized to contract for group health benefit plans for federal employees. (5 U.S.C. § 8902.) Petitioners selected the Kaiser plan from several available to Army Depot personnel and the arbitration clause was disclosed in a brochure made available at a time when they could have elected a different plan. The contract was not the sort of adhesive instrument signed under stress or in misunderstanding that section 1295 was designed to avoid. (See *Wheeler* v. *St. Joseph Hospital, supra*, 63 Cal.App.3d 345.)

## III

■ Finally, petitioners argue that 1295(f) is unconstitutional as a denial of equal protection because the statute distinguishes between persons signing individual medical care contracts and those enrolling in group plans as to requirements for waiver of the fundamental right of trial by jury. The argument fails. Equal protection requires that persons similarly situated receive equal treatment under the law. (See 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 336, p. 3630.) Individuals signing hospital admissions contracts or even individuals purchasing health care plans and employees selecting negotiated

benefit plans from among several alternatives available are simply not similarly situated. It is well within the province of the Legislature to differentiate between the two situations and prescribe more stringent notice requirements for the former.

We hold that the superior court did not abuse its discretion by misapplication of law when it granted Kaiser's motion to compel arbitration. The arbitration clause bars a jury or court trial in this case.

The petition for writ of mandate is denied and the alternative writ is discharged.

Evans, Acting P. J., and Janes, J.,* concurred.

Petitioners' application for a hearing by the Supreme Court was denied April 24, 1980.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.